AO 91 (Rev. 11/82)    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>ARMANDO RODRIGUEZ<br>DAVID ESCALANTE | DOCKET NO.<br>14-0795M<br><br>MAGISTRATE'S CASE NO.<br>FILED<br>CLERK, U.S. DISTRICT COURT<br>APR 18 2014<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY_____ DEPUTY |
|---|---|

Complaint for violation of Title 21, United States Code, Section 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE JAY C. GANDHI | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>April 17, 2014 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Possession of Methamphetamine with Intent to Distribute]

On or about April 17, 2014, in Los Angeles County, within the Central District of California, defendants ARMANDO RODRIGUEZ and DAVID ESCALANTE knowingly and intentionally possessed with intent to distribute 500 grams or more, that is, approximately 5624 grams, of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers

LODGED
2014 APR 18 PM 12: 43
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY_____

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JASON VAN BENNEKUM**<br><br>OFFICIAL TITLE<br>Special Agent – ATF |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>CARLA M. WOEHRLE | DATE<br>April 18, 2014 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Robyn Bacon x4667        REC: Detention

## AFFIDAVIT

I, JASON C. VAN BENNEKUM, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.      I am a Special Agent ("SA") with the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed for over seven years.  Prior to working for ATF, I served as a Senior Patrol Agent in the United States Border Patrol for eight years. I have been involved in the preparation and execution of numerous arrest and search warrants for violations of federal and state firearm and narcotic laws. In the course of my duties as an ATF SA, I have conducted investigations into individuals committing crimes of violence and narcotics trafficking, as well as prohibited persons in the possession of firearms, persons in possession of prohibited firearms, and persons trafficking firearms.

### II.    PURPOSE OF THE AFFIDAVIT

2.      This affidavit is made in support of a criminal complaint for Armando Rodriguez ("RODRIGUEZ") and David Escalante ("ESCALANTE") for violations of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii): possession of methamphetamine with intent to distribute.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.    STATEMENT OF PROBABLE CAUSE

#### A.    Summary of Probable Cause

4.      On April 17, 2014, RODRIGUEZ, ESCALANTE, and Jose Abraham Ibarra met with an ATF undercover agent intending to sell the undercover agent 12 pounds of methamphetamine for $54,000.  After some discussion of the sale, RODRIGUEZ,

ESCALANTE, and Ibarra were arrested.[1]  A bag containing approximately 5624 grams of a mixture or substance containing methamphetamine was recovered from the trunk of their car.

**B.**     **Investigation**

5.     On April 9, 2014, Ibarra sold approximately 458 grams of a mixture or substance containing methamphetamine to ATF SA John Carr, who was acting in an undercover capacity. The sale took place at an ATF undercover warehouse and was video and audio recorded.  In addition to my own observations at the time of the sale, I have spoken to SA Carr and other law enforcement officers about the meeting, reviewed reports and reviewed the recordings.  On April 17, 2014, in case number 14-0788-MJ, United States Magistrate Judge Paul J. Walsh signed a criminal complaint against and issued an arrest warrant for Ibarra, charging him with a violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii).  Attached as Exhibit A and incorporated here by reference is a copy of the complaint and my affidavit in support.

6.     On April 16, 2014, SA Carr placed a recorded phone call to Ibarra.  After the call, I spoke with SA Carr, reviewed the recording and learned the following, among other things:

a.     SA Carr, who had previously told Ibarra that he was going to Las Vegas, told Ibarra in the phone call that he would be back in Los Angeles the following day and wanted to purchase 12 "shoes."  In a previous discussion, SA Carr and Ibarra had agreed that "shoes" would be a code for pounds of methamphetamine.

b.     Ibarra said he would have the methamphetamine ready by 3:00 pm the next day.  SA Carr confirmed with Ibarra the price would be "45," which SA Carr understood to mean $4500 per pound.

6.     On or about April 17, 2014, at approximately 12:05 pm, law enforcement officers began conducting surveillance of Ibarra.  I spoke with Montebello Police Detective Camuy, who

---

[1] As explained in greater detail below, Ibarra had previously sold approximately 458 grams (gross) of methamphetamine to an undercover ATF agent on April 9, 2014.  A separate complaint charging Ibarra with a violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii) was filed in case number 14-0788-MJ.

was the surveillance team leader, and other surveillance officers, and learned the following, among other things:

        a.      Ibarra was observed driving a green Honda Accord California license plate 6XZxx63 to a location on Cantlay Street in North Hollywood, California. A subsequent record check indicated this was the address of RODRIGUEZ;

        b.      At approximately 2:37 pm, Ibarra drove to the North Hollywood Swap Meet and parked next to a gray Honda Accord, California License plate 5DIxx92, that was occupied by a male Hispanic. Surveillance officers were not able to identify the driver of the gray Honda at that time.

        c.      At approximately 4:20 pm, Ibarra met with the same gray Honda Accord in front of Ibarra's residence on Pendleton Street in North Hollywood, California. The driver, later identified as ESCALANTE, was observed driving the vehicle. Ibarra entered the rear passenger seat of the car, then got out of the car a short time later carrying a blue bag. The bag appeared to contain something heavy.

        d.      Ibarra placed the blue bag in the front seat of his green Honda Accord and opened the trunk of his vehicle. Ibarra then placed the blue bag in the trunk and closed it.

        e.      Moments later, Ibarra and a passenger, later identified as RODRIGUEZ, drove to an undercover ATF warehouse ("the UC warehouse"), with ESCALANTE following. Ibarra and RODRIGUEZ drove directly into the UC warehouse while ESCALANTE remained in the parking lot outside.

        8.      On or about April 17, 2014, at approximately 4:28 pm, SA Carr, ATF SA Darrin Kozlowski (acting in an undercover capacity), an ATF Confidential Informant ("CI")[2] met with Ibarra and RODRIGUEZ met at the UC warehouse for the methamphetamine sale Ibarra had arranged with SA Carr on the phone the day before. ATF Task Force members were conducting

---

    [2] The CI's criminal history includes a 1975 felony conviction for Possession of Marijuana for Sale and a 1997 felony conviction for Possession of a Controlled Substance for Sale, as well as a 1991 misdemeanor conviction for petty theft. The CI was paid for his work in this case.

surveillance throughout the meeting and the meeting was both audio and video recorded. After the meeting, I spoke with SA Carr and others, reviewed the audio-video recordings, and learned the following, among other things:

        a.      When Ibarra and RODRIGUEZ arrived, they exited the car and met SA Carr, Kozlowski and the CI in bay area of the UC warehouse. Ibarra introduced RODRIGUEZ as his brother.

        b.      Ibarra hit the trunk release button on his car and the CI opened the trunk. The CI opened the blue bag and SA Carr observed several packages of a substance that resembled methamphetamine. Ibarra told SA Carr that there were "11" (referring to eleven pounds of methamphetamine). Ibarra explained that he tried to get twelve pounds but the last pound did not look like it was of good quality. SA Carr asked if this was going to be the same quality as the last time, in reference to the April 9 deal. Ibarra said that this would be better.

        c.      Ibarra pointed at RODRIGUEZ and said that "this is my right hand man." Ibarra said that he had been making circles around the warehouse earlier in the day and that sometimes RODRIGUEZ says no to a deal if it does not appear look right.

        d.      SA Carr, the CI, Ibarra and RODRIGUEZ then walked into the break room of the UC warehouse. SA Carr asked if future transactions between SA Carr and Ibarra would go smoother. Ibarra said that, at the last deal, his friend was with him. Ibarra said that there have been a lot of people "busted" around the area of the UC warehouse. SA Carr said that if RODRIGUEZ was Ibarra's brother, SA Carr would deal with him "all day long." SA Carr also said that he did not want to see a lot of new people in the future. RODRIGUEZ responded that he "just wanted to see how it was the first time."

        e.      SA Carr asked Ibarra and RODRIGUEZ if the price would be less than $4500 per pound in the future. RODRIGUEZ shook his head indicating it would be cheaper and Ibarra said that "the more you get," the less it will cost. Ibarra said that in future there will be no problems. RODRIGUEZ agreed, saying "faster, faster." RODRIGUEZ added that, after this transaction, they will "start building confidence" in SA Carr.

f.      SA Carr left the break room and Ibarra and RODRIGUEZ were arrested.
ESCALANTE was arrested in the gray Honda in the parking lot outside the UC warehouse.

8.      After Ibarra, ESCALANTE and RODRIGUEZ were arrested, a blue bag
containing 12 individually wrapped packages of suspected methamphetamine was recovered
from the trunk of Ibarra's car.  The contents of the bag weighed 5624 grams (gross).  I conducted
a field test of the contents of the bags and found they tested positive as methamphetamine.

## IV.      CONCLUSION

11.      Based upon the aforementioned facts and my training and experience, I believe
there is probable cause to believe that on April 17, 2014, Armando RODRIGUEZ and David
ESCALANTE violated Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii):
possession of methamphetamine with intent to distribute.


_____
Jason Van Bennekum, Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives


Subscribed to and sworn before me
this 17the day of April 2014.

        CARLA M. WOEHRLE
_____
HONORABLE JAY C. GANDHI
UNITED STATES MAGISTRATE JUDGE

EXHIBIT A

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>JOSE ABRAHAM IBARRA | DOCKET NO. **14 - 0788M** |
|---|---|
| | MAGISTRATE'S CASE NO.<br>APR 17 2014 |

Complaint for violation of Title 21, United States Code, Section § 841(a)(1), (b)(1)(B)(viii)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE PATRICK J. WALSH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>April 9, 2014 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §841(a)(1), (b)(1)(B): Distribution of Methamphetamine]

On or about April 9, 2014, in Los Angeles County, within the Central District of California, defendant JOSE ABRAHAM IBARRA knowingly and intentionally distributed at least 50 grams or more, that is, approximately 458 grams, of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**MICHAEL T. HALUALANI**<br>OFFICIAL TITLE<br>Special Agent – ATF |
|---|---|

| Sworn to before me and subscribed in my presence, | |
|---|---|
| SIGNATURE OF MAGISTRATE JUDGE [1] | DATE<br>April 17, 2014 |

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA R. Bacon x4667    REC: Detention

<u>A F F I D A V I T</u>

I, Michael T. Halualani, being duly sworn, hereby depose and say:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been an ATF SA for more than 26 years. During this time, I have investigated violations of federal statutes governing racketeering, firearms, arson, explosives, murder, and narcotics. I have also investigated violations of state firearms and narcotics laws. I have assisted in the execution of approximately 300 state and federal search warrants. I have also conducted surveillance of individuals committing crimes of violence, individuals trafficking in firearms, individuals trafficking illegal narcotic substances, prohibited persons in possession of firearms, and persons possessing illegal firearms. In addition to training provided by ATF, I have received training in narcotics investigations and the identification and investigation of organized gangs. I have also interviewed confidential informants, cooperating witnesses, criminal defendants, and other persons engaged in violations of federal firearms, murder, racketeering, and narcotics laws.

## II.  <u>PURPOSE OF THE AFFIDAVIT</u>

2.   This affidavit is submitted in support of a criminal complaint for Jose Abraham IBARRA ("IBARRA"), date of birth in August 1980, for violations of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii), and an application for a warrant to search IBARRA's residence, the Subject Premises more fully described below, for evidence of violations of Title 21, United States Code, Section 841(a)(1), possession with intent to distribute and the distribution of controlled substances; and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute controlled substances.

3.   This affidavit is intended to show that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  The statements set forth in this affidavit are based upon my investigation to date, my experience, my training, and other reliable sources of information relative to this investigation.

## III. <u>PREMISES TO BE SEARCHED</u>

4.   The premises to be searched are described in Attachment A and as follows:

a.   The premises known as 11923 Pendleton Street, Sun Valley, California (the "SUBJECT PREMISES").  The SUBJECT PREMISES is further described as a single-story house located on

2

the north side of Pendleton Street between Webb Avenue and Amboy
Avenue.  The numbers "11923" are painted in black on the curb
directly in front of the house.  The exterior of the residence
is yellow stucco and the property is surrounded by a yellow
stucco wall with white metal fencing.  The driveway has a white
metal gate.  The detached garage is located in the rear of the
property and measures approximately 20 ft. by 20 ft. with a
white roll up door.  The front door to the SUBJECT PREMISES is
located in an alcove and faces west.

### IV.   ITEMS TO BE SEIZED

5.   The ITEMS TO BE SEIZED are described in Attachment B,
incorporated herein by reference.

### V.   PROBABLE CAUSE

**A.   On April 9, 2014, IBARRA sold methamphetamine to an
undercover ATF agent**

6.   Based on my review of reports written by ATF SA John
Carr and SA Jason Van Bennekum, and as well as conversations
with SA Carr, SA Van Bennekum, and others, I have learned the
following:

a.   On April 7, 2014, SA Carr spoke with an ATF
Confidential Informant ("CI")[1] who said that he had been in

---

[1] The CI's criminal history includes a 1975 felony
conviction for Possession of Marijuana for Sale and a 1997
felony conviction for Possession of a Controlled Substance for

3

contact with an individual known as Daniel ARMAS on April 6, 2014 to discuss the purchase of 10 pounds of methamphetamine.

b.    On April 9, 2014, SA Carr told the CI to place a call to ARMAS to arrange the purchase of one pound of methamphetamine later that evening.  That afternoon, at approximately 4:00 p.m., SA Van Bennekum, SA Carr, Task Force Officer Brancato, the CI and other ATF agents met at a pre-determined location to discuss that evening's methamphetamine deal.  At that meeting, the CI said that ARMAS had told him that ARMAS was a major supplier of methamphetamine in the San Fernando Valley area and was dealing large quantities of methamphetamine in the Seattle, Washington area.  ARMAS said that he would be willing to sell one pound of methamphetamine to SA Carr for $4500.  ARMAS agreed to meet with the CI and SA Carr at an ATF undercover warehouse ("the UC Warehouse") in Los Angeles, CA.

c.    On April 9, 2014, at approximately 7:00 PM, surveillance was initiated at the UC warehouse.  At approximately 7:15 pm, the CI received a call from ARMAS who said that he was at the pre-designated meet location near the UC warehouse.  At approximately 7:19 PM, the CI was surveilled leaving the UC warehouse and driving to a nearby parking lot.

---

Sale, as well as a 1991 misdemeanor conviction for petty theft. The CI was paid for his work in this case.

In the parking lot, the CI's car approached a silver Volkswagen Jetta, California license plate 5SDXX29 (registered to Alfredo Figueroa). The driver of the silver Jetta – later identified as ARMAS – then followed the CI back to the UC Warehouse. When the silver Jetta arrived at the UC warehouse, ARMAS parked, greeted the CI and walked into the warehouse.

      d.   Once inside, ARMAS said, in Spanish with the CI acting as interpreter, that the supplier of the methamphetamine would be arriving in a few moments driving a blue Honda. Everyone then walked into the front office area of the UC warehouse. The CI introduced ARMAS to SA Carr as "Don Daniel" and told SA Carr that he met ARMAS through a friend in Washington. ARMAS said that he was working for himself and that he had a lot of partners in Mexico. ARMAS also said that he had "customers" in Washington, Oregon and Utah. ARMAS said that he usually only made deliveries between 6 am to 5 pm but was making an exception for SA Carr since this was a first deal and he wanted to "break the ice."

      e.   SA Carr told ARMAS that he worked for people in Las Vegas, Nevada, who were interested in purchasing 8-11 pounds of methamphetamine every 2 to 3 weeks. ARMAS said that he could bring SA Carr 10-20 pounds, but that he was only bringing one pound today. SA Carr told ARMAS that he wanted to purchase one pound first to take it back to Las Vegas to see if his people

liked it.  ARMAS said that if SA Carr liked the first pound, they could negotiate future prices.  ARMAS then said that by the upcoming Saturday he would have a large quantity of methamphetamine to supply SA Carr with.

       f.  ARMAS then received a phone call and said that the supplier of methamphetamine had just arrived at the UC warehouse.  All parties left the front office and walked into the bay area of the UC warehouse.  Around the same time, at approximately 7:36 PM, IBARRA arrived at the UC warehouse driving a black Honda Accord, California License plate 6XZXX63 (registered to Nicole Capucine Grosso).  IBARRA parked in the bay area, got out of his car and greeted SA Carr, TFO Brancato, the CI and ARMAS.  IBARRA then took an orange shoe box from the front passenger's side of the vehicle and walked with the others to the front office.

       g.  In the front office, IBARRA handed the orange box to ARMAS, who pulled a brown paper bag from the box.  ARMAS then pulled a clear plastic zip-lock bag from inside the brown paper bag.  The plastic zip-lock bag appeared to contain the suspected methamphetamine.  ARMAS handed the plastic bag to SA Carr who examined it and weighed it on an electronic scale within the office.  IBARRA said, "You can try it, test it, do whatever, I guarantee the quality."

6

h.    SA Carr told IBARRA that the buyers in Las Vegas used to get their methamphetamine out of Porterville, CA, but that the quality had started to decline.  SA Carr explained that he wanted to purchase one pound first so that the buyers in Las Vegas could see if they liked it.  If they did, SA Carr guaranteed they would purchase 8-10 pounds every 2-3 weeks. IBARRA discussed the declining quality of methamphetamine, saying that he has friends and family that know the problem is because of the conflicts between the cartels and that methamphetamine is now being produced in large batches, which is why the quality is declining.

i.    SA Carr asked if the price would be cheaper if he was purchasing 8-10 pounds every 2-3 weeks.  IBARRA said the prices would be better as long as SA Carr guaranteed to purchase that quantity, explaining "The more you buy, the price is going to go down."

j.    IBARRA told SA Carr that he prefers to appear as if he is living a "normal" life with kids and family in order to avoid drawing attention from law enforcement.  IBARRA stated that his deal is to "make money."  IBARRA explained that he can get pounds of cheaper methamphetamine from other sources, but that he only likes to deal with people who he knows have good quality methamphetamine.  IBARRA stated that he only deals with people he knows and trusts and that they know where he lives and

7

he knows where they live in the event there are any problems.
SA Carr said that he asked ARMAS and IBARRA come to SA Carr's
place of business to meet him in person so that SA Carr could
get a good "feel" for them.

k.   SA Carr retrieved $4500 in U.S. government funds
from a desk drawer, counted it on an electronic currency
counter, and placed it on the desk in front of IBARRA.  IBARRA
picked up the money, counted it, and took possession of it.
ARMAS and IBARRA agreed that SA Carr would start dealing
directly with them and not have to go through the CI.  ARMAS
said that they changed their cellular phone number every month
so they will contact the CI when they next change their cellular
number so that he could provide it to SA Carr.

l.   IBARRA told SA Carr the he wanted to set up a
code word to use with SA Carr on the phone to describe the
methamphetamine.  SA Carr and IBARRA agreed that the code word
would be "shoes" to describe a pound of methamphetamine.  TFO
Brancato asked if SA Carr could call IBARRA directly since he
spoke English primarily and IBARRA agreed.  IBARRA said he was
going to get a new phone number to deal with SA Carr.  IBARRA
said that he would supply SA Carr with methamphetamine every
month.  SA Carr explained that he was leaving for Las Vegas the
following day, would be back next week, and would let them know
how much methamphetamine he needed.  IBARRA asked SA Carr what

was a good time to contact SA Carr with his new phone number and SA Carr replied as soon as he obtained it.

      m.  SA Carr asked IBARRA how long it would take him to get the methamphetamine once SA Carr told him how much he wanted to purchase.  IBARRA said it would take him one day and, if SA Carr called the night before, he could have it ready by the following day.  IBARRA also said that he is currently producing methamphetamine, getting it from a supplier, and has a quantity on hand, so it should not be a problem.  IBARRA again said he would supply SA Carr with the best quality.  The meeting then concluded and IBARRA took the orange shoe box and said, "This is just the beginning."

      n.  At approximately 7:55 pm, ARMAS and IBARRA left the UC warehouse.  SA Van Bennekum retrieved the plastic bag containing the purchased narcotics from SA Carr and weighed it. The plastic bag contained approximately 458 grams gross of a crystalline substance resembling methamphetamine.  SA Van Bennekum conducted a field test of the substance and found it to test positive for methamphetamine.

      o.  On April 16, 2014, SA Carr received a call from IBARRA and they arranged for another purchase of methamphetamine on April 17, 2014.

B.   <u>Surveillance of IBARRA</u>

7.     Based on my review of information from a report
written by SA Van Bennekum and my conversations with other law
enforcement officers, I learned the following:

a.   SA Van Bennekum met with Los Angeles Police
Department ("LAPD") Detective Christopher De La Torre ("Det. De
La Torre") concerning the surveillance of IBARRA and ARMAS after
their April 9, 2014 meeting with SA Carr.

b.   After leaving the warehouse IBARRA and ARMAS
drove in separate cars to a taco truck at the corner of
Lankershim Boulevard and Strathern Avenue in Los Angeles where
they purchased food and both got into IBARRA'S car.

c.   After a short time, ARMAS got out of IBARRA'S car
and they both drove to the SUBJECT PREMISES.

d.   Once at the SUBJECT PREMISES, IBARRA parked his
car in front of the property and walked to the garage, while
ARMAS parked his car on Pendleton Street did not get out.

e.   A short time later, IBARRA was seen in the front
yard of the SUBJECT PREMISES talking to an unknown person and
then walking back to the garage.

f.   IBARRA was seen walking around the SUBJECT
PREMISES until officers stopped the surveillance at
approximately 10:20 PM.

8.    On April 17, 2014, I learned from SA Van Bennekum that, on that day, surveillance officers saw IBARRA walking around the SUBJECT PREMISES.

C.    **Identification of IBARRA and Evidence of IBARRA'S Residence**

9.    On April 16, 2014, I searched Accurint for information about IBARRA.  Accurint is a National Comprehensive Report that shows individuals, their address, residential phone numbers, possible employers, possible business affiliations, possible relatives, and possible properties owned by the person. I learned that Jose Abraham IBARRA, date of birth 8/xx/1980, is listed as currently residing at the SUBJECT PREMISES and has been associated with the SUBJECT PREMISES since MAY 2011.  I also discovered that IBARRA does not have a Social Security Number but instead has been issued an Individual Tax Payer Identification Number ("ITIN")[2] 947-81-xxxx.

_____

[2] An Individual Taxpayer Identification Number (ITIN) is a United States tax processing number issued by the Internal Revenue Service. The IRS issues ITINs to individuals who are required to have a taxpayer identification number but who do not have, and are not eligible to obtain, a Social Security Number.  ITINs are issued regardless of immigration status because both resident and nonresident aliens may have Federal tax return and payment responsibilities under the Internal Revenue Code.

Receiving an ITIN number does not in itself confer the right to work and receive income in the United States. Federal tax law prohibits the IRS from sharing data with other government agencies assuring unauthorized aliens that the tax information will be confidential and will not be used to initiate removal procedures.

ITINs are also used by real estate brokers to facilitate mortgages for unauthorized aliens.  In addition to use by unauthorized aliens, ITINs are

10.   On April 17, 2014, I learned from SA Van Bennekum and others that in multiple phone calls – in particular, in an April 14, 2014 call with the CI and in several calls on April 17, 2014 with SA Carr – IBARRA has identified himself as "Abraham."

11.   During this investigation, I searched California Department of Motor Vehicles records for IBARRA and discovered that IBARRA does not have a California Driver's License or any vehicles registered.

## D.   Probable Cause for Premises to be Searched and Items to be Seized

12.   In addition to the foregoing facts, I have learned during my tenure as an ATF agent that individuals who distribute controlled substances generally maintain records of their illegal transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as a residence.  Individuals distributing controlled substances keep these records on their cell phones/smart phones, computers, flash drives and portable hard drives and do not dispose of these records; they usually keep their records for long periods, often spanning several years, in a secure location within their residence.  Finally, it has been my experience that individuals who distribute

---

used by foreign investors in United States real estate. Such investors need ITINs to file federal and state tax returns to report rental income.

controlled substances will keep the contact information of the individuals they are supplying or receiving controlled substances for future purchases or referrals.

13.   I know that now much correspondence between persons buying and selling controlled substances often occurs by e-mail or text message sent to and from smart phones, laptops, or other digital devices.   This includes sending photos of the controlled substances between the seller and the buyer, as well as negotiation of price.   Therefore, based on my experience, I believe that it is probable that any digital devices found at the subject premises may contain text messages or e-mails between IBARRA and other individuals discussing the sale or transfer of controlled substances.

14.   I know that generally individuals who are undocumented or unauthorized aliens who are engaging in illegal activities in the United States rarely obtain a Driver's License or register vehicles to avoid being identified by investigators.   Also, I know that individuals involved in the distribution of controlled substances will use disposable or untraceable cellular telephones using fictitious names and addresses as subscriber information.

E.   **Training and Experience on Digital Devices**

15.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); and security devices.  Based on my
knowledge, training, and experience, as well as information
related to me by agents and others involved in the forensic
examination of digital devices, I know that data in digital form
can be stored on a variety of digital devices and that during
the search of a premises it is not always possible to search
digital devices for digital data for a number of reasons,
including the following:

     a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a

thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

b.    Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

could contain as many as approximately 450 full run movies or 450,000 songs.

d.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve

residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

      e.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently

used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

　　　f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the

absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

16.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VI. <u>CONCLUSION</u>

17.   Based upon my training and experience, and the facts set forth herein, I submit that there is probable cause to believe that, on April 9, 2014, Jose Abraham IBARRA violated 21 United States Code, Section 841(a)(1), (b)(1)(B)(viii).   I further submit that there is probable cause to believe that the items described in Attachment B are evidence of violations of Title 21, United States Code, Section 841(a)(1), possession with intent to distribute and the distribution of controlled substances; and Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute controlled substances, and will be found at the SUBJECT PREMISES.

_____
Michael T. Halualani
ATF - Special Agent

Subscribed and sworn to before
me this 17th day of April 2014.

_____
UNITED STATES MAGISTRATE JUDGE